UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

JOHN DOE ANTI-TERRORISM OFFICER,  :
               :   06 Civ. 13738 (BSJ)
          Plaintiff, :

  -against-         :

THE CITY OF NEW YORK, BRUCE TEFFT, :

         Defendants. :

-----------------------------------------------------------------X

# PLAINTIFF JOHN DOE ANTI-TERRORISM OFFICER'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BRUCE TEFFT'S MOTION TO DISMISS THE COMPLAINT

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
212-763-5000

# TABLE OF CONTENTS

**PAGE NO(s)**:

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-x

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LEGAL STANDARD FOR A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.     THE FIRST AMENDMENT DOES NOT PROTECT TEFFT'S
           CREATION OF A HOSTILE WORK ENVIRONMENT . . . . . . . . . . . . . . . . . . 9

           A.    The Prohibition Against Hostile Work Environment Under
                  Federal, State, and City Law Is Constitutional . . . . . . . . . . . . . . . . . . . . . 10

           B.    The First Amendment Does Not Protect Tefft's Right to
                  Engage In Employment Discrimination Through the Use
                  of the Spoken Word. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    II.    THE COMMUNICATIONS DECENCY ACT, 47 U.S.C. § 230,
           DOES NOT SHIELD TEFFT'S HARASSING, ILLEGAL AND
           DISCRIMINATORY CONDUCT FROM SUIT . . . . . . . . . . . . . . . . . . . . . . . 19

    III.   BECAUSE TEFFT PARTICIPATED IN THE DISCRIMINATORY
           CONDUCT, HE IS LIABLE AS AN AIDER AND ABETTOR
           PURSUANT TO NEW YORK STATE AND CITY LAW . . . . . . . . . . . . . . . 22

           A.    Plaintiff's Allegations Are Easily Sufficient to Survive
                  A Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           B.    Whether Tefft's Conduct Created A "Severe and Pervasive"
                  Hostile Work Environment Cannot be Resolved on a Motion
                  to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    IV.   THE FEDERAL TORT CLAIMS ACT DOES NOT APPLY TO
           THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    V.    THE COURT HAS PERSONAL JURISDICTION OVER TEFFT . . . . . . . . . . 32

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    The Record Establishing Jurisdiction Is Overwhelming . . . . . . . . . . . . 33

C.    Tefft is Plainly Within New York's Long-Arm Statute . . . . . . . . . . . . . 35

D.    Tefft Has "Minimum Contacts" in New York State . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

**PAGE NO(s)**:

**FEDERAL CASES**:

*Abdi v. Brookhaven Science Associates, LLC*,
    447 F. Supp. 2d 221 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Bernheim v. Litt*,
    79 F.3d 318 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Blumenthal v. Drudge*,
    992 F.Supp. 44 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*,
    518 U.S. 668 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Board of Directors of Rotary International v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Branum v. Clark*,
    927 F.2d 698 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brennan v. Metropolitan Opera Association, Inc.*,
    192 F.3d 310 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Burlingston Indus., Inc. v. Ellerth*,
    524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Capitol Records, Inc. v. Luang Dyi Co.*,
    2004 WL 405961, (S.D.N.Y. March 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Carafano v. Metrosplash.com*,
    339 F.3d 1119 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Chaplinksy v. New Hampshire,*
    315 U.S. 568 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.,*
    461 F.Supp.2d 681 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cleveland v. Caplaw Enterprises,*
    448 F.3d 518 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cunningham v. New York State Dept. Of Labor,*
    2006 WL 2639372 (N.D.N.Y. Sept. 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Curto v. Medical World Communications, Inc.,*
    388 F.Supp.2d 101 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*CutCo Industries, Inc. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*Dawson v. County of Westchester,*
    351 F.Supp.2d 176 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*Dunson v. Tri-Maintenance & Contractors, Inc.,*
    171 F.Supp.2d 103 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Duviella v. Counseling Service of the Eastern District of New York,*
    2001 WL 1776158 (E.D.N.Y. Nov. 20, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*Editorial Musical Latino Americana, S.A. v. Mar Intern. Records, Inc.,*
    829 F.Supp. 62 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Equal Employment Opportunity Commission v. Preferred Management Corp.,*
    216 F.Supp.2d 763 (S.D. Ind. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Feingold v. New York State Dep't of Motor Vehicles,*
    366 F.3d 138 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Frisby v. Schultz,*
    487 U.S. 474 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gagliardi v. Village of Pawling,*
    18 F.3d 188 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Global Network Commcn's, Inc. v. City of New York,*
  458 F.3d 150 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

*Gregory v. Daly,*
  243 F.3d 687 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Hanna v. Plumer,*
  380 U.S. 460 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Harris v. Forklift Sys., Inc.,*
  510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-13, 29-30

*Heskin v. Insite Advertising, Inc.,*
  2005 WL 407646 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hodge v. City of Long Beach,*
  306 F.Supp.2d 288 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Horvath v. Amer. Tire Co.,*
  210 F.Supp.2d 189 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Howley v. Town of Stratford,*
  217 F.3d 141 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Irish Lesbian & Gay Org. v. Giuliani,*
  143 F.3d 638 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,*
  32 F.3d 697 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*Kojak v. Jenkins,*
  1999 WL 244098 (S.D.N.Y. April 26, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*Krasner v. Episcopal Diocese of Long Island,*
  431 F.Supp.2d 320 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Launer v. Buena Vista Winery, Inc.,*
  916 F.Supp. 204 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37

*Lehman v. City of Shaker Heights*,
        418 U.S. 298 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Locurto v. Giuliani*,
        447 F.3d 159 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McCoy v. City of New York*,
        131 F.Supp.2d 363 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Melendez v. Int'l Serv. Sys., Inc.*,
        1999 WL 187071 (S.D.N.Y. April 6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Meritor Sav. Bank, FSB v. Vinson*,
        477 U.S. 57 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

*Mohamed v. Marriott Int'l, Inc.*,
        905 F.Supp. 141 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Oliver v. Gen. Nutrition Ctr.*,
        1999 WL 435208 (S.D.N.Y. June 25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Patane v. Clark*,
        435 F.Supp.2d 306 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Perks v. Town of Huntington*,
        96 F.Supp.2d 222 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Petrosino v. Bell Atlantic*,
        385 F.3d 210 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Petrosky v. New York State Dept. Of Motor Vehicles*,
        72 F.Supp.2d 39 (N.D.N.Y 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pickering v. Board of Educ. Of Township High Sch. Dist.*,
        391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pilates, Inc. v. Pilates Institute, Inc.*,
        891 F.Supp. 175 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35-36

*Pittsburgh Press Co. v. Human Rel. Comm'n*,
        413 U.S. 376 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Prince v. Madison Square Garden*,
    427 F.Supp.2d 372 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 16, 17

*Robinson v. Jacksonville Shipyards, Inc.*,
    760 F.Supp. 1486 (M.D.Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15-17

*Sheppard v. Beerman*,
    18 F.3d 147 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sowemimo v. D.A.O.R. Sec., Inc.*,
    43 F.Supp.2d 477 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*,
    873 F. Supp. 765 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Tomka v. Seiler Corp.*,
    66 F.3d 1295 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22-23

*Torres v. Pisano*,
    116 F.3d 625 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Turner v. Olympic Regional Develop't Auth.*,
    89 F.Supp.2d 241 (N.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. O'Brien*,
    391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wait v. Beck's North America, Inc.*,
    241 F.Supp.2d 172, (N.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Waters v. Churchill*,
    511 U.S. 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Weicherding v. Riegel*,
    160 F.3d 1139 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wisconsin v. Mitchell,*
　　　508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wynder v. McMahon,*
　　　360 F.3d 73 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Zeran v. AOL,*
　　　129 F.3d 327 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


## STATE CASES

*Aguilar v. Avis Rent-A-Car,*
　　　980 P.2d 846 (Sup. Ct. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.,*
　　　62 N.Y.2d 65 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Burns v. City of Detroit,*
　　　253 Mich. App. 608, 660 N.W.2d 85 (2002), *aff'd in relevant part,*
　　　464 Mich. 881, 658 N.W.2d 468 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kreutter v. McFadden Oil Corp.,*
　　　71 N.Y.2d 460 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*RAV v. St. Paul, Minnesota,*
　　　505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-14

*Trovato v. Air Express Int'l,*
　　　238 A.D.2d 333, 655 N.Y.S.2d 656 (2d Dep't 1997) . . . . . . . . . . . . . . . . . . . . . . 23


## FEDERAL STATUTES

28 U.S.C. § 2679(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

47 U.S.C. § 230(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

## STATE STATUTES

C.P.L.R. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

C.P.L.R. 302(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

C.P.L.R. 302(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.P.L.R. 302(a)(3)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

C.P.L.R. 302(a)(3)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

N.Y. City Admin. Code § 8-107(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23-24

N.Y. City Admin. Code § 8-107(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.Y.S.H.R.L § 296(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 22-24, 26-27

N.Y.S.H.R.L. § 296(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## FEDERAL RULES

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 31

## OTHER AUTHORITIES

Balkin, *Some Realism About Pluralism: Legal Realist Approaches to the First Amendment*,
1990 Duke L.J. 375 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fallon, *Sexual Harassment, Content Neutrality and the First Amendment Dog That Didn't Bark*,
1994 Sup.Ct. Rev. 1 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J.M. Balkin, *Free Speech and Hostile Environments*,
99 COLUM. L. REV. 2295 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Sang, *Title VII, Sexual Harassment, Hostile Environments, Sexual Harassment and the First Amendment: No Collision in Sight*,
47 RUTGERS L. REV. 461 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Strauss, *Sexist Speech in the Workplace*,
25 Harv.C.R.-C.L.L.Rev. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Volokh, *Comment, Freedom of Speech and Workplace Harassment*,
39 U.C.L.A. L.Rev. 1791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Plaintiff John Doe Anti-Terrorism Officer ("Plaintiff") submits this memorandum of law in opposition to defendant Bruce Tefft's motion, pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(2), to dismiss Plaintiff's claims against him for aiding and abetting employment discrimination in violation of the New York Human Rights Law § 296(6), and its New York City Administrative Code analogue, § 8-107(8).[1]

## PRELIMINARY STATEMENT

Plaintiff is a highly regarded law enforcement officer employed by the City of New York.  He is also a practicing Muslim and an Arab-American.  Since 1998, Plaintiff has worked in the Intelligence Division of the New York City Police Department ("NYPD"), where he performs undercover intelligence work relating to terrorist threats against the City of New York in the NYPD's prestigious "Cyber Unit."  On December 5, 2006, Plaintiff filed this employment discrimination action because, since the summer of 2002, he has been subjected to almost daily, virulent anti-Muslim and anti-Arab harassment in his workplace.

Much of this harassment originated with Plaintiff's colleague, Bruce Tefft, whom the NYPD hired in 2002 to act as a counterterrorism advisor.  Plaintiff alleges that between the summer of 2002 and December 2005, on an almost daily basis, Tefft sent hundreds of discriminatory anti-Muslim and anti-Arab email briefings to Plaintiff, as well as to Plaintiff's colleagues and supervisors.  Tefft's email briefings ridiculed and disparaged the Muslim religion and Arab people, stating, for example, that "a good Muslim" can't be a "good American," that Muslims should not be hired in "sensitive positions," that Arabs are "backwards," and that Islam

_____

[1]Tefft did not move to dismiss Plaintiff's claim against him pursuant to 42 U.S.C. § 1981. *See* Fourth Claim for Relief ¶¶ 136-142.

1

is not "respectable."  Tefft's emails–which Plaintiff specifically alleges were sent as part of Tefft's job duties as a counterterrorism advisor to the City of New York–struck at the heart of Plaintiff's job responsibilities as an intelligence analyst with top-level security clearance.  Not surprisingly, Tefft's hate-filled and humiliating email briefings had a profoundly negative and debilitating impact on Plaintiff, both professionally and personally.  Tefft's emails poisoned the workplace environment and fomented a culture of distrust in the NYPD Intelligence Division towards Muslim- and Arab-Americans.  Despite Plaintiff's repeated complaints to his supervisors about Tefft's hateful emails, the City of New York failed to do anything to stop it.  Tefft also personally approached Plaintiff's law enforcement colleagues and urged them to shun Plaintiff because he was a Muslim and Arab-American.

In response to Tefft's harassment, and his central role in creating the hostile work environment in which Plaintiff was forced to work for three years, Plaintiff sued Tefft (along with Plaintiff's employer, the City of New York) pursuant to New York Human Rights Law ("NYHRL") § 296(6) and New York City Administrative Code ("NYCAC") § 8-107(6) as an aider and abettor in the discrimination of Plaintiff.  Plaintiff also named Tefft as a defendant pursuant to 42 U.S.C. § 1981.  Defendant Tefft now moves to dismiss the City and State claims on a number of meritless grounds.

First, Tefft argues that, in disseminating his hate-filled anti-Muslim and anti-Arab email briefings in the workplace for almost three years, he was "exercising his freedom of speech."  This argument must be rejected.  The Supreme Court has held that racist speech in the workplace that is so pervasive or severe that it creates a hostile work environment is outside the protective scope of the First Amendment.  *See infra*, Point I.

Second, Tefft argues that Section 230 of the Communications Decency Act shields him from suit.   Section 230 bars lawsuits seeking to hold an Internet service provider liable for its exercise of a traditional publisher's function–such as deciding whether to publish, withdraw, postpone, or alter content.  Obviously, Tefft is not an Internet service provider.  Even if Section 230 did apply to individuals, here Tefft personally authored hundreds of hate-filled discriminatory emails.  Because Tefft is an author, not merely a "forwarder," Section 230 is, again, of no relevance.  Finally, Tefft is an aider and abettor based not only on his emails, but his other deplorable conduct in the office  *See infra*, Point II.

Third, Tefft claims he did not participate in the harassment of Plaintiff, and that the harassment was not severe or pervasive.  Here Tefft simply fights the Complaint, which plainly alleges that Tefft was a primary perpetrator of harassment that occurred on an almost daily basis and severely interfered with Plaintiff's ability to function in the workplace.  *See infra*, Point III.

Fourth, Tefft claims that this suit should have been filed under the Federal Tort Claims Act ("FTCA").  The fatal obstacle for Tefft is that he was not an employee (or even a contractor) of the federal government.  As alleged in the Complaint, Tefft was a contractor for the City of New York, and the FTCA is of no relevance.  *See infra*, Point IV.

Fifth, Tefft argues that the Court lacks personal jurisdiction over him.  But Tefft, who worked in the same New York office as plaintiff and lived for years in New York City, falls well within this Court's jurisdiction.  *See infra*, Point V.

## FACTS

Plaintiff respectfully refers the Court to the Complaint for a full description of Plaintiff's allegations, but for present purposes, offers the following condensed version of the facts as they pertain to defendant Tefft. All of Plaintiff's allegations are taken as true for purposes of this motion. *See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 699-200 (2d Cir. 1994).

Since 1996, the City of New York has employed Plaintiff as a law enforcement officer. Complaint ¶¶ 1, 2. Between 1996 and 1998, Plaintiff was a correction officer in the New York City Department of Correction. *Id.* ¶ 22. Starting in 1998, Plaintiff was assigned to work in the NYPD's Intelligence Division. *Id.* ¶ 24. Since 2001, Plaintiff has been employed as an Intelligence Analyst in the prestigious "Cyber Unit" of the NYPD's Intelligence Division, where he works to identify and stop terrorist threats to New York City. *Id.* ¶ 2. Plaintiff is an Arab-American, and a Muslim. *Id.* ¶¶ 20, 22.

In or around early 2002, Bruce Tefft began serving as an advisor to the NYPD on intelligence and counter-terrorism issues. Tefft provided advising, consulting and/or computer-related services to the City as a contractor for the City of New York with the Orion Corporation. *Id.* ¶ 40. Tefft's work for the City also included developing and maintaining the computer system and database used by the NYPD's Intelligence Division. *Id.* ¶ 38. The City publicly touted Tefft as an intelligence expert who would provide briefings to City employees on anti-terrorism issues. *Id.* ¶ 39. While employed as a contractor for the City, Tefft was assigned to, and worked in, the same physical work location as Plaintiff. *Id.* ¶ 44.

After the City retained Tefft to advise it on intelligence issues, Plaintiff was

4

ordered by his supervisor, the Commanding Officer of the NYPD Intelligence Unit, to sign up to receive daily email briefings from Tefft. *Id.* ¶ 41. The City gave Tefft email access to its employees in the Intelligence Division. *Id.* ¶ 46. Tefft send hundreds of emails to members of the Intelligence Division, including Plaintiff's colleagues and supervisors. *Id.* ¶ 47. Tefft's email briefings were supposed to compile information that would heighten awareness of terrorism threats to New York City, and increase knowledge and expertise amongst Intelligence Division members concerning terrorism-related matters. *Id.* Tefft's email briefings were sent to Plaintiff as part of Tefft's official job responsibilities and duties, pursuant to his status as a contractor for the City of New York. *Id.* ¶ 43.

Between 2002 and December 2005, Tefft sent Plaintiff hundreds of anti-Muslim and anti-Arab email briefings. *Id.* ¶ 48, 49. Many of Tefft's emails stated, in sum or substance, that Muslims and Arabs should not be permitted to perform national security or law enforcement duties given that Muslims and Arabs were all potential terrorists. *Id.* ¶ 51. The Complaint provides 24 specific examples of the hate-filled email that Tefft sent to Plaintiff, *see id.* ¶ 53(a)-(x), including, *inter alia,* the following comments:

- On September 2, 2003, Tefft sent Plaintiff an email stating: "What happens when a Muslim must choose between the Koran (God's word) and loyalty to America? If he's a good Muslim he can't be a good American." *Id.* ¶ 53(a);

- On October 4, 2004, Tefft forwarded Plaintiff an article entitled "1 in 4 Hold Anti-Muslim Views," and stated, "Then 1 in 4 is well informed." *Id.* ¶ 53(g);

- On January 10, 2005, Tefft forwarded Plaintiff an article entitled "Is the Arabic language 'perfect' or 'backwards'?," and stated, "The language may not be backwards but

5

the people speaking it are." *Id.* ¶ 53(l);

> • On April 4, 2005, Tefft sent Plaintiff an email stating: "Muslims in sensitive positions . . . some people are too dumb to learn." *Id.* ¶ 53(n);

> • On May 5, 2005, Tefft sent Plaintiff an email stating: "There are some 14,000 muslims in the US military. Why?" *Id.* ¶ 53(q);

> • On May 19, 2005, Tefft sent Plaintiff an email calling the Koran a "hostile manifesto of a barbaric and fascistic ideology." *Id.* ¶ 53(r);

> • On May 20, 2005, Tefft sent Plaintiff an email stating: "Islam earns the respect or disrespect it has. What is respectable about Islam?" *Id.* ¶ 53(s);

> • On May 25, 2005, Tefft sent Plaintiff an email stating: "We will lose this war if we help the Muslims against ourselves!" *Id.* ¶ 53(t); and

> • On July 5, 2005, Tefft sent Plaintiff an email stating: "Burning the hate-filled Koran should be viewed as a public service at the least." *Id.* ¶ 53(x).

Plaintiff found Tefft's email briefings to be deeply offensive, discriminatory, demeaning, and shocking. *Id.* ¶ 50. Tefft's harassment of Plaintiff was not limited to emails. *Id.* ¶ 68. On a number of occasions, Tefft told Plaintiff's colleagues that they should not trust Plaintiff, or any other Muslim in law enforcement, because "Muslims have no place in law enforcement." *Id.* ¶ 68. On other occasions, Tefft told Plaintiff's colleagues that Muslims in law enforcement could not be trusted with sensitive data, and that a true Muslim cannot be a loyal American. *Id.* ¶ 69.

Plaintiff first attempted to resolve this situation in the summer of 2003 by directly informing Tefft that he found the email briefings degrading and offensive. *Id.* ¶ 71. Tefft simply

ignored Plaintiff's complaints and continued to send harassing email briefings to Plaintiff and other employees, on an almost daily basis. *Id.* ¶ 72. Plaintiff then complained about Tefft's harassment to four different supervisors within the NYPD. *Id.* ¶ 85. Not one of the four City supervisors to whom Plaintiff complained–Sergeant Supervisors Nos. 1-4–prevented the emails or Tefft's hateful commentary from continuing. *Id.* Upon information and belief, other Muslim and Arab-American employees in the Cyber Unit also complained about Tefft's email briefings, again without success. *Id.* ¶ 87.

As set forth more fully in the Complaint, Tefft's hundreds of hateful emails and attempts to isolate and marginalize Plaintiff in the workplace were part of a broader atmosphere of anti-Arab and anti-Muslim intolerance within Plaintiff's unit, where, *inter alia*, employees and supervisors made anti-Muslim comments and jokes, a supervisor regularly listened to a virulently anti-Muslim talk radio show at loud volume, colleagues minimized screens or hid information from Plaintiff but not others, and a colleague left a note on Plaintiff's desk suggesting he apply to work for Al Qaeda. *Id.* ¶¶ 92-99.

Plaintiff filed suit against defendants Tefft and City of New York on December 5, 2006. On February 14, 2007, the City of New York answered the Complaint, and Tefft moved to dismiss.

## LEGAL STANDARD FOR A MOTION TO DISMISS

To survive a motion to dismiss, a plaintiff asserting an employment discrimination claim need only make a "short and plain statement of the claim." Fed. R. Civ. P. 8(a); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002). "This simplified notice

7

pleading standard relies on liberal discovery rules and summary judgment motions to define

disputed facts and issues and to dispose of unmeritorious claims." *Id.* at 512.[2]  So long as the

complaint "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon

which it rests," it is sufficient.  *Id.* (internal citations and quotations omitted).  The complaint

need not even "contain specific facts establishing a prima facie case of discrimination."  *Id.* at

508.  All of the factual allegations in the complaint must be accepted as true and all inferences

drawn in the light most favorable to the plaintiff.  *Jackson*, 32 F.3d at 699-200.  Plaintiff's

detailed 142-paragraph Complaint more than exceeds the basic standards set forth under

*Swierkiewicz*.

      In an analysis under Rule 12(b)(6), the court must also "confine its consideration

to facts stated on the face of the complaint, in documents appended to the complaint or

incorporated in the complaint by reference, and to matters of which judicial notice may be

taken."  *Tarshis*, 211 F.3d at 39.  In support of his motion to dismiss, however, Tefft has

improperly submitted his own Declaration.  It is well settled that under Rule 12(b)(6), the court

may not consider matters outside the pleadings in dispute, unless notice is given to all parties that

the motion is being converted to a motion for summary judgment, and the parties are afforded a

reasonable opportunity to present additional pertinent information.  *Gagliardi v. Village of

Pawling*, 18 F.3d 188, 191 (2d Cir. 1994).

      A motion to dismiss for failure to state a claim should not be granted unless "it

---

[2]Although *Swierkiewicz* involved a Title VII claim, the holding is applicable to the
NYSHRL and NYCHRL claims.  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir.
1995); *Hanna v. Plumer*, 380 U.S. 460 (1965) (procedural requirements in federal court are
governed by federal law, even when state and city substantive law claims are raised).

8

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006) (quoting *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).  This standard must be "applied with particular strictness when the plaintiff complains of a civil rights violation." *Id.*; *see also Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991); *Hodge v. City of Long Beach*, 306 F. Supp. 2d 288, 291 (E.D.N.Y. 2003).

## ARGUMENT

### I.    THE FIRST AMENDMENT DOES NOT PROTECT TEFFT'S CREATION OF A HOSTILE WORK ENVIRONMENT

Tefft argues that, in disseminating his hate-filled anti-Muslim and anti-Arab email briefings in the workplace for almost three years, he was "exercising his freedom of speech." Memorandum of Law In Support of Motion to Dismiss of Defendant Tefft ("Tefft Br.") at 4. Tefft characterizes his email briefings as constitutionally-protected "broadcast emails" constituting "advocacy of his personal opinions" in connection "with the practice of his profession as a counter-terrorism expert." *Id.* at 4-5.  But Tefft fails to cite even a single case, from any court in the country, where a claim of hostile work environment harassment against an individual was dismissed on this ground.[3]

---

[3]In the one case Tefft does cite, *Burns v. City of Detroit*, 253 Mich. App. 608, 660 N.W.2d 85 (2002), *aff'd in relevant part*, 468 Mich. 881, 658 N.W.2d 468 (2003), the Court of Appeals of Michigan *rejected* an argument by defendants in a sexual harassment action that the defendant-officers' harassment (continually referring to plaintiff as a "bitch," calling her a "fucking female," and ridiculing her lack of a man) constituted protected speech, ruling instead that: (1) the officers' statements were not protected speech, and (2) the hostile work-environment sexual harassment provisions of the antidiscrimination statutes did not unconstitutionally chill the police officers' rights to free speech, and thus liability could be imposed without raising

Tefft may not use the First Amendment to shield his discriminatory acts.  The right to free speech is far from absolute, *see Chaplinksy v. New Hampshire*, 315 U.S. 568, 571 (1942) ("the right of free speech is not absolute at all times and under all circumstances"), and First Amendment jurisprudence often balances the value of protecting speech against other societal interests.  A statute that is otherwise valid, and is not aimed at expression–such as the New York City and State antidiscrimination statutes under which Tefft is sued–does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984) ("[A]cts of invidious discrimination in the distribution of publicly available goods, services and other advantages cause unique evils that government has a compelling interest to prevent–wholly apart from the point of view such conduct may transmit.  Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection.").

A.     **The Prohibition Against Hostile Work Environment Under Federal, State, and City Law Is Constitutional**

The United States Supreme Court has held that sufficiently severe or pervasive harassment on the basis of a prohibited category (race, color, religion, sex, national origin) constitutes "employment discrimination" in violation of Title VII of the Civil Rights Act of 1964.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Contrary to Tefft's claim that his harassing speech is constitutionally protected, "[i]n the workplace . . . the First Amendment does allow people to

---

vagueness and overbreadth concerns.

recover for harms  . . . when (and only when) such harms so materially alter workplace conditions that they constitute employment discrimination under Title VII.  The test of material alteration is the test of *Harris v. Forklift Sys., Inc.*, and *Meritor Savings Bank v. Vinson*." J.M. Balkin, *Free Speech and Hostile Environments*, 99 COLUM. L. REV. 2295, 2309-2310 (1999).

Under *Harris* and *Meritor*, a hostile work environment exists when, as judged by a reasonable person, "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65, 67) (internal quotations omitted)).[4]  In short, in recognizing hostile work environment as a form of employment discrimination, Congress and the courts have balanced First Amendment interests with the value of workplace equality by limiting liability to those cases where "severe or pervasive" abuse, based on race, religion, color, sex, and national origin, "materially alters" employment conditions, from the perspective of both the "plaintiff or a reasonable person."

> An employer that posted a "Whites Only" sign outside its workplace could not claim that the First Amendment right of free expression shielded its "speech" from the reach of a law prohibiting racial discrimination in employment (*cf. Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376 (1973) ("male help wanted" and "female help wanted" designations constitute unprotected employment discrimination), and an employer that utters or tolerates racial epithets or insults in the workplace that are so severe or pervasive as to alter the working conditions of targeted minority employees similarly may not take refuge in the claim that the racial harassment, because spoken, may not constitutionally be treated as employment discrimination.

*Aguilar v. Avis Rent-A-Car*, 980 P.2d 846, 856, n.6 (Cal. 1999).

---

[4]In *Harris,* the Supreme Court clarified that in order for conduct to constitute harassment under a "hostile environment" theory, it must both: (1) be viewed subjectively as harassment by the victim; and (2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment.  510 U.S. at 21-22.

This result is consistent with the important interests served by antidiscrimination laws in fostering workplace equality for women, people of color, and other protected groups. Explaining the potentially debilitating effects of hostile work environment harassment, the United States Supreme Court has observed: "A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22. "Title VII gives women and minorities an equal right to pursue work and an equal right to workplace opportunities. . . . Employers must take steps to achieve nondiscriminatory workplaces, and this includes restricting employee speech and behavior that contribute to a hostile work environment." Balkin, *Free Speech* at 2306.

In *R.A.V. v. St. Paul, Minnesota*, the Supreme Court specifically noted that harassing words are not protected by the First Amendment. 505 U.S. 377, 389 (1992). As Justice Scalia observed, "since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech . . . *Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices.* Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a

discriminatory idea or philosophy." 505 U.S. at 389 (citations omitted) (emphasis added).[5]

Courts and legal commentators have since noted that "[w]hen the majority and concurring

opinions are viewed in conjunction, it appears that all nine Justices participating in *R.A.V.*

assumed that the core Title VII prohibition against speech that creates a discriminatorily hostile

work environment would pass constitutional muster." Fallon, *Sexual Harassment, Content*

*Neutrality and the First Amendment Dog That Didn't Bark*, 1994 Sup.Ct. Rev. 1, 12 (1994); *see*

*Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (Title VII is "an example of a permissible

content-neutral regulation of conduct") (citing *R.A.V.*).

        The Supreme Court's decisions in *Harris*, *Meritor*, *R.A.V.*, and *Wisconsin v.*

*Mitchell* teach that the First Amendment permits imposition of civil liability for speech that

creates a hostile work environment.  Other courts directly addressing this issue have also found

that racially and sexually derogatory speech constituting workplace harassment is not protected

under the First Amendment.  *See Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486,

1534-37 (M.D.Fla. 1991) (collecting cases, containing extensive analysis of First Amendment

issues in discrimination cases).  Even Eugene Volokh, on whose work defendant so heavily

relies, Tefft Br. 7, 8, concludes that only the prohibition of "undirected" speech that contributes

to the creation of a hostile work environment would offend the First Amendment:  "Liability

could be imposed not for any speech that creates a hostile work environment, but only for speech

that the speaker knows is offensive, that is directed at an employee because of her race, sex,

_____

        [5]Thus, Tefft is incorrect when he states that "neither the United States Supreme Court nor
the Second Circuit Court of Appeals has considered whether, or to what extent, hostile work
environment law should be limited due to free speech concerns." Tefft Br. 8.  Justice Scalia's
opinion in *RAV* specifically notes that regulation of harassing language in the workplace is
consistent with the First Amendment.

religion, or national origin, and creates (together with whatever other nonspeech conduct might be present) a hostile work environment." Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 U.C.L.A. L.Rev. 1791, 1846, fn. omitted (1992).

It is therefore sufficient for Plaintiff to allege that Tefft's email harassment and other conduct was (1) sufficiently "severe or pervasive" (Plaintiff alleges that he received hundreds of harassing emails from Tefft, on an almost daily basis for three years), (2) so as to "alter the conditions of the victim's employment" (Plaintiff alleges that Tefft's harassment interfered with his ability to function as a member of his elite anti-terrorism unit, Complaint ¶ 70; that he complained about it to at least four supervisors, *id.* ¶ 85; and that Tefft's conduct created a workplace atmosphere "where it was acceptable to voice anti-Muslim sentiments," *id.* ¶ 96), and (3) engendered a "hostile or abusive work environment" from the perspective of both Plaintiff and other Arab and Muslim employees who also complained about Tefft's conduct, *id.* ¶ 87, and (4) that Tefft's conduct was based on Plaintiff's race, religion, and national origin.

### B.      The First Amendment Does Not Protect Tefft's Right to Engage In Employment Discrimination Through the Use of the Spoken Word

In addition to the argument set forth above, numerous other reasons support Plaintiff's position that the First Amendment does not bar his claims against Tefft for aiding and abetting in discrimination in the workplace.

First, the proscription of sexually or racially harassing words by way of antidiscrimination laws is permissible because these laws are essentially directed against conduct rather than speech. *See R.A.V.*, 505 U.S. at 389. In this case, Tefft's discriminatory emails, and his personal approaches to co-workers urging a boycott of Plaintiff and other Muslim employees

in the Intelligence Division, are not speech because they were used as a method of employment discrimination. *See Robinson,* 760 F.Supp. at 1535 (posting of sexually explicit pictures and employees' verbal harassment not protected under the First Amendment); *Roberts*, 468 U.S. at 628; Strauss, *Sexist Speech in the Workplace*, 25 Harv.C.R.-C.L.L.Rev. 1, 38-41 (1990); Balkin, *Free Speech* at 2307 ("[L]ike perjurious statements, speech used to create a hostile work environment is unprotected not because of its content, but because in the social context in which it occurs, it is used as a method of employment discrimination.").

Second, the free speech guarantee of the U.S. Constitution "admits great latitude" in protecting captive audiences from offensive speech. *See Frisby v. Schultz*, 487 U.S. 474 (1988) (upholding a ban on residential picketing directed at a single house); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 301-04 (1974) (plurality opinion) (upholding ban of political advertising on public buses on grounds that passengers are captive audience). Victims of hostile work environment harassment are the quintessential "captive audience." Balkin, *Free Speech* at 2310 ("the practical necessities of earning a living . . . create captive audience situations"). "Few audiences are more captive than the average worker . . . Certainly, if employer-employee relations involve sufficient coercion that we justify regulation in other contexts, then this coercion does not suddenly vanish when the issue is submission to racist or sexist speech." Balkin, *Some Realism About Pluralism: Legal Realist Approaches to the First Amendment*, 1990 Duke L.J. 375, 423-3. Plaintiff was "ordered and directed by his supervisor, the Commanding Officer of the NYPD Intelligence Division Unit, to sign up to receive daily email briefings from Tefft." Complaint ¶ 41. Because Plaintiff was plainly a captive audience to Tefft's discriminatory, hate-filled rantings, Tefft's harassment may, again, form the basis of Plaintiff's

claim without offending free speech principles. *See Aguilar*, 980 P.2d at 162 (Werdegar, J.,
concurring) ("[a]lthough defendant Lawrence may desire to offer his apparently low opinion of
the Latino workers at his place of employment, plaintiffs apparently do not wish to hear it.
Further, plaintiffs were not free to walk away easily from Lawrence's speech . . . or otherwise
avoid hearing his unwanted message.").

Regulation of discriminatory speech in the workplace is also a permissible time,
place and manner regulation. *See Robinson*, 760 F. Supp. at 1535; *see also* Strauss, *supra*, at 46
("[B]anning sexist speech in the workplace does not censor such speech everywhere and for all
time."); *Equal Employment Opportunity Commission v. Preferred Management Corp.*, 216
F.Supp.2d 763, 809 (S.D. Ind. 2002) (finding it a "well-settled principle that speech which may
be unassailable in the streets–even if provocative or repugnant–is not necessarily protected in the
workplace."). This type of regulation requires a legitimate governmental interest unrelated to the
suppression of speech, content neutrality, and a tailoring of the means to accomplish this interest.
*See e.g. United States v. O'Brien*, 391 U.S. 367, 377 (1968). The eradication of workplace
discrimination is a compelling government interest. *See Robinson*, 760 F.Supp. at 1535 (citing
cases); *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 549
(1987). Discrimination "both deprives persons of their individual dignity and denies society the
benefits of wide participation in political, economic and cultural life." *Roberts*, 468 U.S. at 625;
*see also Hishon v. King & Spalding*, 467 U.S. 69 (1984) (rejecting law firm's claim that
associational rights permit it to refuse partnership to women). Title VII's prohibition of
employment discrimination is also content-neutral and unrelated to the suppression of
expression. *See, e.g., Roberts*, 468 U.S. at 624 (holding that the state's goal of "eliminating

16

discrimination and assuring its citizens equal access to publicly available goods and services"
was "unrelated to the suppression of expression"). Title VII (and its New York City and State
analogues)–and the law of hostile work environment–are also tailored to the goal of eradicating
workplace discrimination. *See* § I(A). The overwhelming majority of speech in the workplace is
permitted; only harassment that is so severe or pervasive as to alter the very conditions of
employment is prohibited.

Fourth, even interests much less compelling than eradicating discrimination
outweigh free speech interests in the context of public employment and contracting. A
governmental employer may, for example, discipline or discharge employees without violating
the First Amendment, where an employee's exercise of free expression is unduly disruptive, or
undermines the morale of the workforce. *See, e.g., Weicherding v. Riegel*, 160 F.3d 1139 (7th
Cir. 1998) (summary judgment affirmed against a prison guard terminated for engaging in Ku
Klux Klan and white supremacist speech and activities because activity, while otherwise
protected, was insufficient to overcome public employer's interest in a safe and efficient work
place); *Pickering v. Board of Educ. Of Township High Sch. Dist.*, 391 U.S. 563 (1968)
(describing disruption defense in First Amendment employment cases); *Waters v. Churchill*, 511
U.S. 661 (1994) (plurality op.). The interests of the employee in free expression are balanced
against the employer's interests in maintaining discipline and order in the workplace. *See
Robinson*, 760 F.Supp. at 1536. This weighing of disruption and free speech interests also exists
in the context of government contracting. *See Board of County Com'rs, Wabaunsee County,
Kan. v. Umbehr*, 518 U.S. 668, 676-680 (1986) (*Pickering* test applies in contractor context).
Had the City, for example, terminated Tefft for poisoning Plaintiff's work environment with his

17

barrage of hateful emails and attempts to marginalize and isolate Plaintiff in the office, Tefft would plainly have had no First Amendment retaliation claim. *See, e.g., Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) (City permitted to terminate off-duty police and fire officers who wore "blackface" while on a parade float; "defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive interests"). Tefft certainly has no First Amendment defense here.

Tefft repeatedly suggests that because his email briefings did not mention Plaintiff by name, and were sent to many NYPD employees, Plaintiff has no claim. Tefft Br. 4. Tefft is wrong. It is settled in the Second Circuit that offensive material directed at all employees (and not just at the plaintiff) can form the basis of a hostile work environment claim. *See, e.g., Petrosino v. Bell Atlantic*, 385 F.3d 210, 222 (2d Cir. 2004) ("The fact that much of this offensive material was not directed specifically at Petrosino–indeed, her male co-workers would likely have traded sexual insults every morning and defaced terminal boxes with sexual graffiti regardless of Petrosino's presence in the I & R department–does not, as a matter of law, preclude a jury from finding that the conduct subjected Petrosino to a hostile work environment based on her sex."); *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 320 (2d Cir. 1999) ("[d]isplays of photos of Blacks being lynched or of nude women in sexually provocative poses would not be insulated from Title VII claims simply because the photos were observable by all office employees, White and Black, male and female.") (Newman, J., concurring in part and dissenting in part). Tefft's vitriolic anti-Arab and anti-Muslim emails, though sent to many NYPD Intelligence Division employees and supervisors, had a disproportionately demeaning impact on Plaintiff and other Muslim and Arab-American employees. If anything, by sending

these emails not just to plaintiff but to the entire NYPD Intelligence Division, including

Plaintiffs' colleagues and supervisors, Tefft contributed to an even *more* severe and pervasive

hostile work environment, in which, day after day, the *entire workplace* read and condoned

racist, hateful emails targeted at Arab-Americans and Muslims like Plaintiff.

 The First Amendment does not shield Tefft from liability for repeatedly

attacking Plaintiff's fitness to serve as a law enforcement officer on the basis of his national

origin, race and religion, either through the use of ugly, discriminatory email attacks, or by direct

appeals to co-workers to ostracize Plaintiff because he was a Muslim law enforcement officer.

No First Amendment interest is substantially furthered by allowing free reign to severe and

pervasive harassment in the workplace.  *See* Sangree, *Title VII Prohibitions Against Hostile*

*Environment Sexual Harassment and the First Amendment*: *No Collision in Sight*, 47 RUTGERS

L. REV. 461, 479 (1995).  Tefft's motion to dismiss on this ground should be rejected.

## II.   THE COMMUNICATIONS DECENCY ACT, 47 U.S.C. § 230, DOES NOT SHIELD TEFFT'S HARASSING, ILLEGAL AND DISCRIMINATORY CONDUCT

 Tefft next gamely argues that he is shielded from suit pursuant to a provision of

the Communications Decency Act ("CDA") of 1996, which provides that "[n]o provider or user

of an interactive computer system shall be treated as the publisher or speaker of any information

provided by another information content provider."  47 U.S.C. § 230(c)(1).  Tefft argues that

because his anti-Muslim and anti-Arab email briefings were "for the most part merely forwarded

publicly available news stories borrowed from other news sources," Tefft Br. 9, 47 U.S.C.

§ 230(c)(1) prohibits Plaintiff's claims against him under the New York State and City

19

antidiscrimination laws.  Again, Tefft does not cite a single case where a court found that 47

U.S.C. § 230(c)(1) immunized workplace harassment from suit because the harasser did not

himself author the offensive materials, but "merely" forwarded offensive materials to his victim

via the Internet.

Tefft's argument suffers from three fatal flaws: he is not an Internet service

provider; he did not merely forward articles, but wrote and sent plenty of his *own* discriminatory

speech; and Tefft's liability is based not just on his emails, but on his other deplorable conduct in

the workplace.

Section 230(c)(1) of the CDA provides immunity from liability for providers and

users of an "interactive computer system" who publish information provided by others.  This

section exists to protect Internet service providers.  *See Zeran v. AOL*, 129 F.3d 327, 330 (4th

Cir. 1997), *cert. denied* 524 U.S. 937 (1998) (holding that Section 230 "creates a federal

immunity to any cause of action that would make service providers liable for information

originating with a third-party user of the service.").  Section 230 "precludes courts from

entertaining claims that would place a computer service provider in a publisher's role.  Thus,

lawsuits seeking to hold a service provider liable for its exercise of a traditional publisher's

function–such as deciding whether to publish, withdraw, postpone, or alter content–are barred."

*Id.*; *see also Blumenthal v. Drudge*, 992 F.Supp. 44, 49-53 (D.D.C. 1998) (AOL has Section 230

immunity from liability for the content of an independent contractor's news reports); *Carafano v.*

*Metrosplash.com*, 339 F.3d 1119 (9th Cir. 2003) (Internet dating service provider was entitled to

Section 230 immunity from liability stemming from third party's submission of false profile);

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 461 F.Supp.2d

681 (N.D. Ill. 2006) (Section 230 provides a safe harbor for ISPs that "publish" classified ads that violate the Fair Housing Act).

Tefft offers no legal support for his novel theory that Section 230 limits the reach of antidiscrimination laws if a harasser chooses to forward publicly-available text or images from the Internet as the vehicle of his harassment. Tefft's argument also leads to absurd results. By Tefft's logic, a harasser could forward thousands, perhaps millions, of pornographic images or articles to a co-worker, or white supremacist news articles, or just about any link, article, or image–no matter how offensive or hateful–and do so with impunity and immunity from any and all antidiscrimination statutes. There is absolutely no reason to believe that Congress intended such an absurd result.

In any event, the Court need not reach this question because Tefft did not "merely forward" Plaintiff "certain publicly available news stories." Tefft Br. 9. As alleged repeatedly in the Complaint, Tefft wrote *his own* anti-Arab and anti-Muslim email messages, and then circulated these comments (sometimes with a news article attached) to Plaintiff and other employees. It is *Tefft* who wrote that "a good Muslim" can't be a "good American," that Muslims should not be hired in "sensitive positions," that Arabs are "backwards," and that Islam is not "respectable." Complaint ¶ 5. Tefft (grudgingly) admits as much in his brief, though he states (falsely and in a transparent attempt to minimize his own wrongdoing) that "in very few cases," he "may have added an editorial comment" to the email. Tefft Br. 9. In fact, Tefft appended his own racist commentary to hundreds of articles that were sent to Plaintiff, not "very few." Even if Tefft were somehow permitted by Section 230 to forward and disseminate any link or article in the workplace (no matter how offensive, racist, or hateful)–something Congress

plainly never intended–Tefft also sent Plaintiff literally hundreds of email briefings that included

*his own* harassing and hateful "editorial comments." These racist diatribes by Tefft himself

plainly have nothing to with Section 230.

In addition, although Tefft's brief conveniently omits the point, "[Tefft's]

harassment of Plaintiff was not limited to emails." Complaint ¶ 68. Tefft repeatedly solicited

and approached Plaintiff's co-workers in an effort to marginalize Plaintiff in the workplace,

urging them repeatedly not to trust Plaintiff because "Muslims have no place in law

enforcement." Complaint ¶¶ 68, 69. Needless to say, Section 230 does not protect this conduct

either.

## III.   BECAUSE TEFFT PARTICIPATED IN THE DISCRIMINATORY CONDUCT, HE IS LIABLE AS AN AIDER AND ABETTOR UNDER NEW YORK STATE AND CITY LAW

Plaintiff sued Tefft pursuant to NYHRL § 296(6), *see* Second Claim for Relief

¶¶ 124-129, and its NYCAC analogue, 8 § 101 *et seq.*[6] *See* Third Claim for Relief ¶¶ 130-135.

As the Second Circuit held in *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)

(abrogated on other grounds by *Burlingston Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)), unlike

Title VII, the NYHRL § 296(6) imposes liability on individual employees under the aider and

abettor provision of the statute. The Second Circuit has held that "a defendant who actually

participates in the conduct giving rise to a discrimination claim may be held personally liable."[7]

---

[6] Contrary to Tefft's moving papers, Tefft Br. 11-12, 17, plaintiff has not sued Tefft under Title VII. Plaintiff's first cause of action pursuant to Title VII is brought only against defendant the City of New York. *See* Complaint at 20.

[7] As Tefft notes, this aspect of *Tomka*–exposing individual employees to liability–has been criticized by some New York state courts. *See e.g. Trovato v. Air Express Int'l*, 655 N.Y.S.2d

*Id.*; *see Dawson v. County of Westchester*, 351 F.Supp.2d 176, 198 (S.D.N.Y. 2004); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F.Supp.2d 477, 490 (S.D.N.Y. 1999) ("[E]mployees may be held personally liable under the [NYS]HRL and the NYCHRL if they participate in the conduct giving rise to the discrimination claim.").

Under both the NYSHRL and the NYCHRL, an individual may be liable as an "aider or abetter." *See* NYHRL § 296(6); NYCHRL § 8-107(6). Under the Executive Law, it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any the acts forbidden under this article or attempt to do so." N.Y. Exec. Law § 296(6) (McKinney 2001). The Administrative Code uses virtually identical language, *see* N.Y. City Admin. Code § 8-107(6), and is subject to the same analysis as the Executive Law. *See McCoy v. City of New York*, 131 F.Supp.2d 363, 375 (E.D.N.Y. 2001) (applying same standard to claims under § 296(6) and § 8-107(6)); *see also Mohamed v. Marriott Int'l, Inc.*, 905 F.Supp. 141, 157 (S.D.N.Y. 1995) (noting that identical wording of the Executive Law and Administrative Code evince "clear intent" for parallel interpretation).

In this case, Plaintiff alleges that Tefft was a principal perpetrator of the harassment. *See, e.g.*, Complaint ¶ 4 ("[m]uch of this harassment originated with a colleague, Bruce Tefft"); *id.* ¶ 49 ("Between 2002 and December 2005, Mr. Tefft sent Plaintiff hundreds of

---

656, 657 (2d Dep't 1997) (one-page order, with little analysis, ignoring plain language of § 296(6)). Whatever the split among (and even within) New York State appellate divisions, *Tomka* is the current law in the Second Circuit and is binding on lower federal courts. *Duviella v. Counseling Service of the Eastern District of New York*, 2001 WL 1776158, at *17 (E.D.N.Y. Nov. 20, 2001); *Kojak v. Jenkins*, 1999 WL 244098, at *7 (S.D.N.Y. Apr. 26, 1999); *Petrosky v. New York State Dept. Of Motor Vehicles*, 72 F.Supp.2d 39, 65 (N.D.N.Y 1999); *Oliver v. Gen. Nutrition Ctr.*, 1999 WL 435208, at *3 (S.D.N.Y. June 25, 1999); *Patane v. Clark*, 435 F.Supp.2d 306, 313 (S.D.N.Y. 2006) (noting that although some state courts have disagreed with *Tomka*, federal courts in this circuit are bound to follow the Second Circuit).

23

anti-Muslim and anti-Arab email briefings."). Tefft is liable under the NYSHRL § 296(6) and

NYCHRL § 8-107(6) for "actually participating" in the discriminatory conduct. *Tomka*, 6 F.3d at

1317.[8]

Tefft may be held liable under the NYSHRL § 296(6) and NYCHRL § 8-107(6)

whether he was an employee or an independent contractor for the City of New York. It is well-

established that an individual may be liable under § 296(6) for directly participating in the illegal

conduct, regardless of his status. "Because a claim under § 296(6) may be made against a

defendant who has no control or authority over plaintiff, even a defendant that is an independent

contractor for the employer may be held liable, as long as there is direct participation in the

discriminatory acts." *Dunson v. Tri-Maintenance & Contractors, Inc.*, 171 F.Supp.2d 103, 114

(E.D.N.Y. 2001) (independent contractors and private investigator may be liable under § 296(6)

for aiding and abetting discriminatory termination); *Heskin v. Onsite Advertising, Inc.*, 2005 WL

407646, at *25 (S.D.N.Y. 2005) ("by making sexual advances to Heskin and then inciting or at

least aiding *Onsite's* firing of Heskin, Stern–a "person" although not an Onsite employee–aided

and abetted Onsite's principal violation."). Tefft, as an independent contractor for the City of

New York, may be held liable as an aider and abettor of discrimination pursuant to NYHRL

§ 296(6) and NYCHRL § 8-107(6).

---

[8]Tefft is mistaken in his brief, Tefft Br. § I.D(2)(a) at 12, where he argues that Plaintiff's "claim" pursuant to NYSHRL § 296(1) should be dismissed. Plaintiff asserts a claim against Tefft pursuant to § 296(6) (the aider/abettor section), not § 296(1).

**A.      Plaintiff's Allegations Are Easily Sufficient to Survive A Motion to Dismiss**

Tefft concedes that if he were a direct participant in the discriminatory conduct, he would be liable under the antidiscrimination laws. Tefft Br. 14. But Tefft claims–incredibly, in light of the detailed allegations in the Complaint to the contrary–that there are no allegations that he "personally participated in any of the harassing conduct." *Id*. Tefft also argues that "there is no allegation that defendant independently sent emails to plaintiff or affirmatively contacted plaintiff in any way." Tefft Br. 15.

What complaint is Tefft reading? The Complaint alleges that Tefft not only personally participated in the illegal harassment, but was a *primary* perpetrator of the harassment against Plaintiff and other Arab-American and Muslim employees. *See* Complaint ¶ 4 ("[m]uch of this harassment originated with a colleague, Bruce Tefft"); *id*. ¶ 4 ("Between the summer of 2002 and December 2005, on an almost daily basis, *Tefft* sent discriminatory anti-Muslim and anti-Arab email briefings *to Plaintiff*, to his colleagues, and to his supervisors. These email briefings ridiculed and disparaged the Muslim religion and Arab people, and stated that Muslim- and Arab-Americans were untrustworthy and could not reliably serve in law enforcement positions or handle sensitive data."); *id*. ¶ 6 ("Tefft's emails struck at the heart of Plaintiff's job responsibilities as an intelligence analyst with top-level security clearance. Tefft's hate-filled and humiliating email briefings were distributed to virtually all City employees who worked in the NYPD's Intelligence Division, including the highest-ranking members of that division and Plaintiff's supervisors."); *id*.¶ 49 ("Between 2002 and December 2005, *Mr. Tefft sent Plaintiff* hundreds of anti-Muslim and anti-Arab email briefings."); *id*. ¶ 50 (plaintiff found Tefft's emails to be "deeply offensive, discriminatory, demeaning, and shocking"); *id*. ¶ 52 (Tefft's emails

25

attacked Plaintiff's fitness to work in law enforcement and in the Cyber Unit); *id.* ¶ 53 (setting

forth specific writings by Tefft contained in dozens of discriminatory emails that he sent to

Plaintiff); *id.*¶ 68 ("On a number of occasions, Tefft stated to Plaintiff's colleagues that they

should not trust Plaintiff, or any other Muslim in law enforcement, because 'Muslims have no

place in law enforcement.'");  *id.*¶ 69 ("On other occasions, Tefft stated to these colleagues that

Muslims in law enforcement could not be trusted with sensitive data, and that a true Muslim

cannot be a loyal American."); *id.*¶¶ 71-72 (Tefft continued to send hateful commentary to

Plaintiff after Plaintiff personally objected to Tefft).

   Plainly, the Complaint "is replete with allegations that Defendant [Tefft] actually

participated in the conduct giving rise to the Complaint." *Perks v. Town of Huntington*, 96

F.Supp.2d 222 (E.D.N.Y. 200) (finding plaintiff had adequately alleged that defendant was an

aider and abettor and denying motion to dismiss).  In case after case in this Circuit, courts have

routinely denied similar identical motions to Tefft's.  *See e.g. Cunningham v. New York State

Dept. Of Labor*, 2006 WL 2639372, at *3 (N.D.N.Y. Sept. 12, 2006) (denying defendant's

motion to dismiss NYHRL § 296(6) claim because plaintiff provided "sufficient notice" of his

claim); *Krasner v. Episcopal Diocese of Long Island*, 431 F. Supp.2d 320 (E.D.N.Y. 2006)

(denying motion to dismiss § 296(6) claim); *Prince v. Madison Square Garden*, 427 F. Supp.2d

372 (S.D.N.Y. 2006) ("it is too early to dismiss Prince's claim of 'aiding and abetting' liability

against Halkett under the NYSHRL and the NYCAC"); *Wait v. Beck's North America, Inc.*, 241

F.Supp.2d 172 (N.D.N.Y. 2003) (denying motion to dismiss § 296(6) claim because complaint

alleged that individual defendant "engaged in the conduct giving rise to [plaintiff's] claim.");

*Abdi v. Brookhaven Science Associates, LLC*, 447 F. Supp. 2d 221 (E.D.N.Y. 2006) (denying

motion to dismiss § 296(6) claim where complaint alleged, *inter alia*, that individual defendants "actually participated in the alleged discriminatory and/or retaliatory conduct"); *Curto v. Medical World Communications, Inc.*, 388 F.Supp.2d 101, 108 (E.D.N.Y. 2001) (same); *Horvath v. Amer. Tire Co.*, 210 F. Supp.2d 189, 193-94 (E.D.N.Y. 2002) ("the complaint states a claim of hostile work environment sexual harassment against Farrugio, because Horvath alleges that Farrugio actually created the hostile work environment . . . plaintiff has satisfied her de minimus burden of establishing a prima facie case of gender discrimination against Farrugio, whose motion to dismiss the NYHRL claim is denied."); *Bass*, 129 F.Supp.2d at 505 (denying motion to dismiss aider and abettor claim where plaintiff specifically identified incidents of discrimination in which defendant participated); *Turner v. Olympic Regional Dvlpm't Auth.*, 89 F.Supp.2d 241, 243 (N.D.N.Y. 2000) (denying motion to dismiss aiding and abetting claim); *Kojak v. Jenkins*, 1999 WL 244098, at * 7 (S.D.N.Y. Apr. 26, 1999) (denying motion to dismiss NYHRL and NYCAC aiding and abetting claims).[9]

---

[9]*See also Melendez v. Int'l Serv. Sytms., Inc.*, 1999 WL 187071, at *15 (S.D.N.Y. April 6, 1999) (same); *Dawson*, 351 F.Supp.2d at 199 (denying summary judgment motion, and finding that allegations of a hostile work environment–"distributing copies of the [] letters to other officers, making inappropriate comments to plaintiffs, staring at plaintiffs in a disturbing manner and engaging in inappropriate conversations with others within plaintiffs' hearing"–were sufficient to sustain liability under NYHRL §296(6)); *Duviella v. Counseling Serv. of E. Dist. Of N.Y.*, 2001 WL 1776158, at *18 (E.D.N.Y. Nov. 20, 2001) (primary perpetrator of alleged sexual harassment may be liable under NYSHRL); *Feingold v. New York State Dep't of Motor Vehicles*, 366 F.3d 138, 158 (2d Cir. 2004) (triable issue of fact as to whether named individual defendants "actually participated" in conduct, where evidence showed that individuals "all participated in creating a hostile work environment").

Plaintiff's allegations of Tefft's aiding and abetting conduct are more than sufficient to sustain claims against him pursuant to the NYSHRL and NYCAC. Tefft's motion to dismiss on this ground must be denied.

### B.   Whether Tefft's Conduct Created A "Severe and Pervasive" Hostile Work Environment Cannot be Resolved on a Motion to Dismiss

In a related point, Tefft argues that the Complaint "does not allege any personal contact or communication between Tefft and plaintiff," and thus that "the allegations of Tefft's *conduct* are insubstantial and insufficient to support a claim" that Tefft created or participated in creating a severe and pervasive hostile work environment. Tefft Br. 16. There are two significant obstacles to this argument: (1) Plaintiff explicitly and repeatedly alleges that Tefft directly sent him discriminatory and harassing emails which created an intolerable work environment for Plaintiff; and (2) whether these emails and Tefft's other misconduct are sufficient to establish severe or pervasive discrimination, is, at best for Tefft, a question he may attempt to raise on summary judgment. More likely, it is a question of fact to be resolved at trial. *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (on a 12(b)(6) motion, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims") (internal quotation marks and citations omitted).

At this stage in the proceedings, Plaintiff has alleged more than sufficient facts to establish that Tefft aided and abetted in the creation of a workplace that was permeated with severe, pervasive discrimination. *See Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) (African-American state police officer's complaint, in action alleging race discrimination, met minimum pleading standards since complaint, although not a model of brevity or clarity, was sufficient to

permit defendants to answer and prepare for trial, allowed application of res judicata, and

identified nature of case so that it could be assigned proper form of trial); *Torres v. Pisano*, 116

F.3d 625, 631 (2d Cir. 1997) (concluding that "general allegations of constant abuse" created a

jury question as to severity and pervasiveness, "even in the absence of specific details about each

incident").

      Plaintiff's pleadings provide Tefft with fair notice of the nature of the claims

against him.  Plaintiff has literally provided a log of some of the dates of Tefft's harassment, and

the precise content of a representative sample of Tefft's harassing emails.  *See* Complaint ¶ 53;

*Gregory v. Daly*, 243 F.3d 687, 693 (2d Cir. 2001) ("[a]lthough Gregory has offered neither a

verbatim transcript nor a log of dates and times, these allegations were certainly sufficient to put

defendants on notice of the nature of the claims against them.").

      Plaintiff's allegations, if proven, establish that Plaintiff was required to endure an

environment that was objectively severely and pervasively hostile.  Plaintiff alleges that Tefft

sent him hundreds of demeaning and offensive emails, on an almost daily basis, for three years.

Plaintiff further alleges that Tefft took affirmative steps, such as approaching plaintiff's co-

workers and urging them not to trust plaintiff because he is Muslim, that undermined Plaintiff's

position and standing in his unit.  *See Howley v. Town of Stratford*, 217 F.3d 141, 154-56 (2d

Cir. 2000) (holding that conduct "diminishing the respect accorded [plaintiff] by subordinates

and thereby impairing her ability to lead" can constitute a hostile work environment).  Plaintiff

alleges that Tefft created just the sort of environment that "can and often will detract from

employees' job performance, discourage employees from remaining on the job, or keep them

from advancing in their careers," contrary to "Title VII's broad rule of workplace equality."

*Harris*, 510 U.S. at 22.  Plaintiff's allegations provide ample basis for a determination that his

work environment "would reasonably be perceived as . . . hostile or abusive." *Harris*, 510 U.S.

at 22.  Taking the allegations in the Complaint as true, there is also no dispute that the work

environment was perceived by Plaintiff as hostile or abusive, *i.e.*, that he subjectively

experienced it that way.  *See, e.g.*, Complaint ¶ 50 ("Plaintiff found Tefft's email briefings to be

deeply offensive, discriminatory, demeaning, and shocking.").

## IV.  THE FEDERAL TORT CLAIMS ACT DOES NOT APPLY TO THIS CASE

Tefft next argues that because the NYPD's Intelligence Division operated under

the auspices of the federal High Intensity Drug Trafficking Areas (HIDTA) Program (as alleged

in paragraph 24 of the Complaint), Tefft is transformed into a federal employee, and this case

should have been brought against the United States pursuant to the Federal Tort Claims Act.  The

Federal Tort Claims Act provides the exclusive remedy for "injury or loss of property or personal

injury or death arising from or resulting from the negligent or wrongful act or omission *of any*

*employee of the Government* while acting within the scope of his office or employment."  28

U.S.C. § 2679(b)(1) (emphasis added).

The fatal obstacle for Tefft is that he was not an employee (or even a contractor)

of the federal government.  As alleged in the Complaint, Tefft was a contractor for the City of

New York.  *Id.* ¶ 40 ("Bruce Tefft provided advising, consulting and/or computer-related services

to the City as a contractor for the City of New York with the Orion Corporation"), ¶ 43 ("Tefft's

email briefings were sent to Plaintiff as part of Tefft's official job responsibilities and duties,

pursuant to his status as a contractor for the City of New York.").  The Complaint specifically

alleges that Tefft was hired by the New York City Police Department to act as a counterterrorism advisor for the City of New York. *Id.* ¶ 4.

Here Tefft simply fights the allegations in the Complaint. Nowhere does the Complaint allege that Tefft "provided services to the HIDTA while on assignment with the Orion Corporation." Tefft Br. 18. To the contrary, the Complaint repeatedly states that Tefft was a contractor for the City of New York, not the federal government. *See e.g.* Complaint ¶¶ 4, 40, 43. Tefft also claims that he provided consulting services to the federal HIDTA program. Tefft Br. 19. But the Complaint alleges that Tefft provided consulting services to the City of New York. *See* Complaint ¶¶ 4, 40, 43. Beyond the fact that a federal agency lent the NYPD office space in which to operate its Intelligence Division, there is no allegation that Tefft had anything to do with the federal government.

In any event, to the extent that Tefft is now claiming that he was a contractor for the federal government, (as opposed to a contractor for the City of New York, as Plaintiff alleges), this is a factual dispute that cannot be resolved at this juncture. On a motion to dismiss, the Court is obliged to accept as true all allegations in plaintiff's Complaint.[10] Here, Plaintiff alleges that Tefft was a contractor for the City of New York. Tefft's claim that this action should

---

[10]Although a motion to dismiss is limited to attacking the allegations in the Complaint, Tefft improperly submitted a lengthy factual Declaration in support of his motion to dismiss. Short of converting the motion to one for summary judgment, the Court may not consider matters outside the pleadings–including this Declaration–in support of Tefft's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See Global Network Commcn's, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006) (district court committed reversible error in considering matters outside the pleadings on a 12(b)(6) motion). Nonetheless, Tefft admits in this Declaration that he was employed by Orion Scientific Systems between 1998 and 2004. *Id.* ¶ 4. He admits that, after 9/11, his employer Orion entered into a contract with the NYPD to provide software services. *Id.* ¶ 18. Finally, he admits that, acting as an employee of Orion, he provided counter-terrorism and intelligence consulting services to the NYPD Intelligence Division. *Id.* ¶ 19.

have been filed pursuant to the Federal Tort Claims Act is meritless.

Contrary to the Federal Rules of Civil Procedure, Tefft's motion repeatedly attempts to inject matters outside the Complaint into this motion to dismiss. Almost all of his statements with respect to his employment are false, misleading or half-truths.[11] It is for this reason that the Court is confined to the pleadings in evaluating the sufficiency of the Complaint on this motion to dismiss. *See Global Network Commcn's, Inc.*, 458 F.3d at 154. Were this Court to consider Tefft's improper extraneous factual declaration, plaintiff would respectfully requests the opportunity to submit additional factual briefing to the Court, after discovery is completed in this case.[12]

## V.    THE COURT HAS PERSONAL JURISDICTION OVER TEFFT

### A.    Standard of Review

"It is well-established that when motions are made pursuant to Rule 12," including Rule 12(b)(2), "the plaintiff's complaint and affidavits are to be construed, and any doubts are to be resolved, in the light most favorable to the plaintiff." *Pilates, Inc. v. Pilates*

---

[11]Indeed, Bruce Tefft's biography, posted on the website of an entity (the Institute of Investigate Science) which lists him as Instructor, states that he was an advisor to the City of New York on counterterrorism issues. *See* http://www.iois.net/BruceTbio.htm ("Since 9/11 he has served as the New York Police Department's Counter-Terrorism and Intelligence advisor.") Discovery in this case will further confirm that Tefft worked as a contractor for the City of New York, not as a contractor for the federal government, as he is now claiming in this litigation.

[12]For example, in its response in the EEOC proceeding that preceded this litigation, the City of New York conceded that Tefft worked for a vendor to the City of New York (Orion Corporation), which developed and maintained computer systems for the City of New York. The City of New York's position to date already factually contradicts Tefft's claim to be a federal contractor. Discovery in this case will further bear out that Tefft was a contractor for the City of New York. Plaintiff is entitled to substantiate this allegation in the Complaint in discovery.

*Institute, Inc.*, 891 F.Supp. 175, 178 (S.D.N.Y. 1995). Plaintiff need only make a "prima facie case for jurisdiction over a defendant in order to survive a motion to dismiss" and "plaintiff will be found to have met his or her burden even if the moving party makes contrary allegations that place in dispute the factual basis of plaintiff's prima facie case." *Id.*; *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (same); *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F. Supp. 765, 769-70 (E.D.N.Y. 1995); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (facts "alleged in plaintiff's complaint and affidavits" are "accept[ed] . . . as true for the purposes of resolving th[e] jurisdictional dispute").[13]

## B.     The Record Establishing Jurisdiction Is Overwhelming

Tefft's own declaration conclusively establishes that he is within this Court's jurisdiction. Tefft admits that he "traveled to New York, for business reasons," Tefft Decl. ¶ 5; "commuted frequently to NYC" to perform "consulting services as a counter-terrorism and intelligence adviser to the NYPD Intelligence Division," *id.* ¶ 19, for which he was paid by his employer Orion Scientific Systems, which had a contract with the New York Police Department, *id.* ¶¶ 18-20; that Tefft provided "training and consulting" in "the offices of the New York City Police Department" in New York City, *id.* ¶ 23; that, on multiple occasions while speaking to members of the NYPD in New York City, he advertised and marketed his email listserve, *id.* ¶ 24; and that he met Plaintiff at least once in New York City, during which time Plaintiff

---

[13]Tefft's declaration is proper *only* insofar as it relates to his Rule 12(b)(2) motion. *See* cases cited in § V(A), *supra*.

expressed his objections to Tefft's offensive emails, *id.* at ¶ 28.[14]

In addition, Tefft does not deny the allegations in the Complaint that he knowingly and deliberately sent thousands of emails to Plaintiff and others in New York City, through a service he now admits to have advertised and marketed directly to members of the NYPD while in New York City.

These admissions plainly establish the Court's jurisdiction over Tefft.  But Tefft had many more contacts with New York than he has explicitly admitted.  As set forth in the attached declaration of Plaintiff in opposition to Tefft's Rule 12(b)(2) motion, Tefft regularly worked in New York City, in the very same offices as Plaintiff, as part of the NYPD's antiterrorism program.  Declaration of Plaintiff dated March 15, 2007 ("Pl. Decl.") ¶ 2.  Between 2002 and 2004, Tefft worked in New York, worked in the same building, on the same floor, and just a few cubicles away from Plaintiff.  Tefft had his own cubicle, his own computer, and (because he worked in Plaintiff's building *in New York*) his own swipe card to enter the building.  *Id.*  He worked regularly in New York.  *Id.* ¶¶ 2, 11.[15]  While in New York (and while in the same office space as Plaintiff), Tefft sent hundreds of emails *from* New York City, *to* Plaintiff in New York City.  *Id.* ¶ 4.  Tefft admits that he sent "50-100 email messages daily."  Tefft Decl. ¶ 15.  Each day he was in New York, Tefft sent some 50-100 email messages from New York, to Plaintiff, who was in New York (a few cubicles away).

---

[14]*See also* Tefft Br. 24-25 (admitting that Tefft provided consulting services in New York City between 2002 and 2004, worked in and "commuted frequently to New York City," and met Plaintiff in New York City).

[15]Apparently Tefft also lived in an apartment in Manhattan. *Id.* ¶ 10.  He even applied for and received a license to carry a gun in New York State. *Id.*

Plaintiff and Tefft encountered each other not once, but on a regular basis (always in the New York office, of course). *Id.* ¶¶ 3, 6-7. Often, when Plaintiff was discussing issues related to his work with a supervisor, the supervisor referred Plaintiff to Tefft, just down the hall. *Id.* ¶ 3. During one conversation, Tefft told Plaintiff (in the New York office) that Mecca should be blown up, even if Plaintiff's mother were performing the Hajj in Mecca. *Id.* ¶ 6. On another occasion, Plaintiff told Tefft that his emails were deeply offensive, and that his personal commentary should stop. Tefft responded by sending Plaintiff more anti-Muslim, anti-Arab personal commentary, in hundreds more emails. *Id.* ¶ 7. While at the New York office, Tefft also (and on a number of occasions) told Plaintiff's colleague at work not to trust or share information with Plaintiff, because he is a Muslim. *Id.* ¶ 8.

## C.    Tefft is Plainly Within New York's Long-Arm Statute

In evaluating Tefft's Rule 12(b)(2) motion, the Court should look to the law of the forum in which the court sits. *See Launer v. Buena Vista Winery, Inc.*, 916 F.Supp. 204, 208 (E.D.N.Y. 1996); *CutCo*, 806 F.2d at 365.

Tefft makes no serious claim that he falls outside of New York's long-arm statute, N.Y. CPLR 302. *See* Tefft Br. 22-23. Tefft fails to cite a single case, or make any specific argument with respect to CPLR 302, and for good reason. Tefft plainly "transact[ed] . . . business within the state." CPLR 302(a)(1). He also "contract[ed] to supply . . . services in the state." *Id.* Although a defendant "need not actually enter New York to be viewed as transacting business in the state," Tefft did enter New York, for days, weeks, months, and years. *Pilates*, 891 F.Supp. at 179. CPLR 302(a)(1) is a "single act statute" and proof of even "one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New

35

York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 466 (1988). Tefft not only "enter[ed]" New York; he worked in New York for years, a few cubicles away from Plaintiff. His business in New York was to provide training, consulting services and emails to members of the NYPD, the very conduct that is the basis for his liability in this case. Tefft's activities in New York were "purposeful," and there is a "substantial relationship" between his activities in New York and the claims against him. *Pilates*, 891 F.Supp. at 179. Viewing "the totality of the circumstances," *id.*, there is little question that Plaintiff has made a *prima facie* showing of personal jurisdiction over Tefft here. *See, e.g.*, *Launer*, 916 F.Supp. at 209-210 (California defendants "transact[ed] business" in New York within CPLR 302(a)(1) where only a couple of the acts that formed the basis for Plaintiff's Title VII claim occurred in New York).

Tefft also does not dispute that he "commit[ed] a tortious act within the state." CPLR 302(a)(2). *See* Tefft Br. 22-23. He sent hundreds of hateful emails (from his cubicle on Plaintiff's floor in New York) to Plaintiff (a few cubicles away, in New York). His offensive in-person comments to Plaintiff were all made in the office, in New York. His comments to Plaintiff's colleague at work were made in New York. All of these acts subject Tefft to personal jurisdiction under CPLR 302(a)(2). *See Launer*, 916 F.Supp. at 210-11 (Title VII violations and acts of discrimination within New York bring foreign defendant within CPLR 302(a)(2); "The phrase 'tortious acts' encompasses more than simply torts.") (collecting cases).[16]

---

[16]*See also Editorial Musical Latino Americana, S.A. v. Mar Intern. Records, Inc.*, 829 F.Supp. 62, 64 (S.D.N.Y. 1992) (copyright infringement is "tortious act" within CPLR 302(a)(2))

36

Tefft also falls within CPLR 302(a)(3)(i), because he repeatedly "commit[ed] a tortious act without the state causing injury to person or property within the state" while "regularly do[ing] or solicit[ing] business, or engag[ing] in any other persistent course of conduct . . . in New York." On those days in which he was not in New York, Tefft sent hundreds more emails (50-100 a day, by his estimate) to Plaintiff, causing Plaintiff injury. This discriminatory and harassing conduct satisfies the first prong of the 302(a)(3)(i) test. *Launer*, 916 F.Supp. at 211. Tefft also engaged in a "persistent course of conduct" in New York, such as working in New York on a regular basis for years, training members of the NYPD in New York, and interacting with Plaintiff in New York on an almost daily basis.[17]

**D.      Tefft Has "Minimum Contacts" in New York State**

Instead of addressing CPLR 302, Tefft focuses exclusively upon the "minimum contacts" requirement of the Due Process Clause. But if a defendant falls within New York's long-arm jurisdictional statute, as Tefft essentially concedes, then a plaintiff has also satisfied the less-demanding "minimum contacts" test. *See Capitol Records, Inc. v. Kuang Dyi Co.*, 2004 WL 405961, at *2 (S.D.N.Y. March 4, 2004) ("Ordinarily . . . if jurisdiction is proper under the

---

(collecting cases).

[17]Tefft may also fall within CPLR 302(a)(3)(ii), because, while committing tortious acts without the state causing injury to Plaintiff within the state, Tefft "expect[ed] or . . . reasonably expect[ed] the act to have consequences in the state and deriv[ed] substantial revenue from interstate or international commerce." Tefft plainly expected his emails to have consequences in New York: Plaintiff *told* Tefft that he felt humiliated by the email commentary, yet Tefft continued to send more hateful comments to Plaintiff anyway. Tefft could also have expected many others within the NYPD to be extremely upset by his anti-Arab, anti-Muslim diatribes. Tefft also likely derived substantial revenue from his work, because (by his own admission) he received a salary from Orion to provide training and consulting services to the NYPD.

CPLR, due process will be satisfied because CPLR 302 does not reach as far as the constitution permits.") (collecting cases); *Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.*, 62 N.Y.2d 65, 71 (1984) ("CPLR 302 does not go as far as is constitutionally permissible.").

Tefft has more than minimum contacts in New York State.  He was paid by his employer to work in New York, conduct training of the NYPD in New York, and advertise and market his email "listserv" in New York.  Tefft actually worked for weeks, months, and even years in New York, in the very same NYPD antiterrorism office as Plaintiff, interacted on a number of occasions with Plaintiff in those offices in New York, and (while in New York) sent hundreds of emails to Plaintiff and to others in New York.  Tefft had a swipe card to enter Plaintiff's office building and apparently lived in an apartment in Manhattan.  Tefft's suggestion that he could not reasonably be expected to be "haled into court" in New York is, to put it mildly, meritless.

Tefft's final argument, that Plaintiff somehow initiated email contact with Tefft and therefore Tefft is not within the Court's jurisdiction, is equally unconvincing.  *Tefft* initiated thousands of emails.  *Tefft* sent the emails, not Plaintiff.  When Plaintiff–who was required by his supervisor to receive the emails–told Tefft that his email commentary was offensive, Tefft made offensive comments to Plaintiff in person (in New York) and sent yet more emails (many from New York), with hateful commentary.  These are not "random, fortuitous, or attenuated contacts," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985), but purposeful, repeated acts, perpetrated by someone not only in New York, but in Plaintiff's *own office*.

Tefft's 12(b)(2) motion should be denied.

38

## CONCLUSION

For the reasons set forth above, Tefft's motion to dismiss should be denied in its entirety.

Dated: March 16, 2007
      New York, New York

                     EMERY CELLI BRINCKERHOFF &
                     ABADY LLP

               By: _____

                     Ilann M. Maazel (IM-5724)
                     Katherine Rosenfeld (KR-8525)
                     75 Rockefeller Plaza
                     New York, New York 10019
                     (212) 763-5000